# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BRIONJRE MARTAI ODELL HAMILTON, )<br>)<br>Defendant. ) | Case No. CR-22-314-SLP |

## SENTENCING MEMORANDUM

Respectfully submitted,

*s/ Frances C. Ekwerekwu*
Frances C. Ekwerekwu
ASSISTANT FEDERAL PUBLIC DEFENDER
Bar Number 32613
215 DEAN A. McGEE AVENUE, Suite 109
OKLAHOMA CITY, OKLAHOMA  73102
(405)609-5967   FAX (405) 609-5932

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................................................. ii

**SENTENCING MEMORANDUM** ......................................................................................... 1

**NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF MR. HAMILTON** ........................................................ 2

   *Nature and circumstances of the offense* ............................................................................ 2
   *History and characteristics of the defendant* ..................................................................... 7

**THE NEED FOR THE SENTENCE IMPOSED** ................................................................ 13

**THE KINDS OF SENTENCE AND THE SENTENCING RANGE ESTABLISHED FOR THE APPLICABLE CATEGORY OF OFFENSE COMMITTED BY THE APPLICABLE CATEGORY OF DEFENDANT AS SET FORTH IN THE GUIDELINES** ........................................................................................................................ 14

**PERTINENT POLICY STATEMENTS ISSUED BY THE SENTENCING COMMISSION** ........................................................................................................................ 14

**FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM** ...................................................................................... 15

**THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT** ...................................................................................... 16

**NEED TO PROVIDE RESTITUTION** ................................................................................ 16

**CONCLUSION** ........................................................................................................................ 17

**CERTIFICATE OF SERVICE** ............................................................................................ 17

# TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*, 552 U.S. 38, 55 (2007) ................................................................. 16

*U.S. v Luna*, 165 F.3d 316 (5th Cir.1999) ................................................................. 4, 5, 7

*U.S. v. Rowlett*, 23 F.3d 300 (10th Cir. 1994). ........................................................ 4, 5, 6

**STATUTES**

18 U.S.C. § 922(a)(6) ............................................................................................................ 5

18 U.S.C. §3553(a) ................................................................................................................ 1

18 U.S.C. §3582(a) ................................................................................................................ 1

18 U.S.C. §3661 .................................................................................................................. 14

**OTHER AUTHORITIES**

The Centers for Disease Control and Prevention: Adverse Childhood Experiences (ACEs)
   https://www.cdc.gov/violenceprevention/aces/index.html .............................................. 9

The National Child Traumatic Stress Network
   https://www.nctsn.org ...................................................................................................... 9

**U.S. SENTENCING GUIDELINES**

§ 2K1.1(b)(4) ................................................................................................................ 4, 6, 7

§ 2K2.1(b)(4) ................................................................................................................ 4, 5, 6

§ 2K2.1(b)(4)(A) ............................................................................................................... 3, 6

§ 2K2.1(b)(5) ......................................................................................................................... 3

§ 5H1 .................................................................................................................................... 15

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. CR-22-314-SLP |
| BRIONJRE MARTAI ODELL HAMILTON, | ) ) ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM**

Brionjre Martai Odell Hamilton, through counsel, Frances C. Ekwerekwu, submits this Sentencing Memorandum addressing the statutory factors set forth in 18 U.S.C. §3553(a). The Presentence Report provides an overall advisory sentencing guideline range of imprisonment of 46 months to 57 months. Counsel submits a sentence below the bottom of the advisory guideline range will more than satisfy the statutory goals of sentencing.

The primary directive in §3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." In determining whether and to what extent imprisonment is appropriate, the Court is required to "recogniz[e] that imprisonment is *not* an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §3582(a) (emphasis added).

## NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF MR. HAMILTON

*Nature and circumstances of the offense*

The specific acts concerning the offense of conviction are addressed in paragraphs 15 through 27 of the Presentence Report (hereinafter PSR) filed April 3, 2023.  Doc. 42.  Mr. Hamilton provided false statements to federally licensed firearm dealers in attempts to purchase firearms.  *Id.*  Mr. Hamilton, like many Oklahomans, liked to collect firearms.  His criminal history would eventually bar him from building and keeping his firearm collection.  *PSR ¶¶ 20, 21.*  Poverty, his tough upbringing in a lacking environment, his lengthy mental health history, and lack of guidance at critical times in his life led Mr. Hamilton to the instance offense.

Many of the guns Mr. Hamilton purchased from licensed federal firearm dealers were stolen from him at various times and locations, including: from the garage of his grandmother's home, from within his vehicle while living in his vehicle on his grandmother's property, and from his vehicle while parked at a place of business.  *PSR ¶¶ 16, 17, 21, 64.*  Each time he realized firearms had been stolen from him, Mr. Hamilton nearly immediately reported the stolen firearms to authorities.  *Id.* at *¶¶ 16, 17, 21*.  Mr. Hamilton does not know who stole the various firearms from him.  He was never made aware of the status or subsequent use of the stolen firearms until informed in an interview with investigators in this matter.  *PSR ¶ 22.*

The PSR writer in this matter suggests this offense involved stolen firearms as attributable to Mr. Hamilton and a two-level increase to the base offense level is warranted

under USSG § 2K2.1(b)(4)(A). *PSR ¶35.* The Defense objects to this notion and suggested base offense level increase. Mr. Hamilton and the Defense assert Mr. Hamilton reported to police, and investigators in this matter, when various firearms in his possession were stolen. *PSR ¶¶ 16, 17, 21.* The PSR rightfully indicates, and Mr. Hamilton maintains, all the firearms he purchased or attempted to purchase were from licensed federal firearm dealers, not from any other source. *PSR ¶¶ 1-7, 26.* None of the firearms he purchased or attempted to purchase were reported stolen prior to his contact with said firearms. *Id.* Further, there is no evidence he had knowledge of the firearm burglaries prior to the guns being stolen from him. Further, Mr. Hamilton did not know what happened to any of the stolen firearms until he was told about one stolen firearm in an investigatory interview related to this prosecution. *PSR ¶ 22.*

The PSR writer contends, "The defendant's relevant conduct included transferring firearms to others, and then reporting said firearms stolen." (*Response by probation officer to Defense's objections to PSR paragraphs 35, 40, 44 and 80, page 21 of Final Presentence Investigation Report filed April 3, 2023, Doc. 42*). In contrast, the PSR writer also acknowledges, "There was insufficient information to determine whether the defendant was involved in trafficking of firearms. An enhancement pursuant to USSG § 2K2.1(b)(5) was not applied." *PSR ¶ 36.* The PSR writer's assessment regarding a lack of evidence determining Mr. Hamilton transferred or trafficked firearms to others is correct and supported by the evidence in this matter. *Id.* Mr. Hamilton did not traffic firearms. Thus, it cannot be an appropriate application pursuant USSG § 2K2.1(b)(4)(A) to increase Mr. Hamilton's base offense level based on firearms that were stolen from Mr. Hamilton,

3

firearms he did not transfer or traffic to others. Mr. Hamilton was burglarized; he did not orchestrate or participate in the thefts of the firearms in his possession. Further, he reported the firearms stolen nearly immediately after realizing they were no longer in his possession.

The PSR writer further asserts, "There is no requirement that the firearm must have been stolen prior to the defendant possessing it. *See U.S. v Luna*, 165 F.3d 316 (5th Cir.1999)." *Supra*. In *Luna*, the defendant pled guilty to a single count indictment of knowingly possessing five stolen firearms that he and two others obtained after burglarizing a residence. *U.S. v. Luna*, 165 F.3d 316, 318 (5th Cir. 1999). The defendant, Luna, argued, "the district court improperly increased his offense level under § 2K2.1(b)(4) — '[i]f any firearm was stolen' — because the firearms were not 'stolen' when he acquired possession of them during the course of the burglary." *Id.* at 324. Luna's argument relied on the reasoning and conclusion reached by the Tenth Circuit in *United States v. Rowlett*[1]. *Id.* "The *Rowlett* court held that an enhancement under subsection (b)(4) applies only when the firearm had already been stolen prior to the defendant's taking possession of it. Focusing on the fact that the Guideline is written in the past tense, the *Rowlett* court reasoned that subsection (b)(4) was concerned not with the way in which the firearms were acquired by a particular defendant but with their condition (stolen or not stolen) when acquired." *Id.*

Ultimately, the *Luna* court disagreed with the past tense interpretation of USSG § 2K2.1(b)(4) determined in *Rowlett* and applied an interpretation 'in the context of the entire

---

[1] *U.S. v. Rowlett*, 23 F.3d 300, 301 (10th Cir. 1994).

firearms Guideline.'" *Id.* at 324, 325. The *Luna* court found, "Luna (1) illegally entered a home, (2) stole the firearms during the commission of the burglary, and (3) departed with the stolen guns in his possession. This course of conduct clearly triggered the application of § 2K2.1(b)(4)." *Id.*

In contrast to the *Luna* case and many other cases involving stolen firearms, Mr. Hamilton did not participate in stealing or purchasing stolen firearms. He purchased and attempted purchases of firearms from federally licensed dealers. He was later burglarized and some of the said purchased firearms were stolen from him. Appropriately, he quickly reported to authorities the firearms had been stolen. Accordingly, Mr. Hamilton pled guilty to counts of making false statements during the attempted purchase of a firearm.

Like Mr. Hamilton in the instant matter, the defendant Rowlett in *Rowlett* pled guilty to providing a false statement in the acquisition of a firearm at Oshman's Sporting Goods in violation of 18 U.S.C. § 922(a)(6). " *U.S. v. Rowlett*, 23 F.3d at 302. Rowlett utilized a fictitious driver's license and a counterfeit check to obtain the firearm. *Id.* Rowlett challenged a two-level increase imposed by the district court pursuant to § 2K2.1(b)(4) in that, via a counterfeit check and false driver's license, Rowlett acquired the firearm "by way of fraud," and thus, the gun was "stolen" within the meaning of § 2K2.1(b)(4). *Id.* at 303.

In reviewing the language interpretation made by the district court in Rowlett, the Tenth Circuit Court of Appeals discussed the significance of timing when the weapon became a "stolen" firearm. *Id.* at 304. In this discussion, the Court found error in the *Rowlett* district court's reading of "the term 'stolen' to mean not the existing condition of

5

the firearm at the time of the offense in question (*i.e.,* whether it *was* a stolen weapon or '*had* an altered or obliterated serial number') (emphasis added), but instead to mean the weapon's condition after the consummation of the instant offense which transformed the weapon into being a stolen firearm. While the court's interpretation may seem possible upon an isolated reading of the term 'stolen', it ignores the meaning made clear by the context in which the term appears:

> Defendant's Sentencing Memorandum and Objections to the Presentence Report, page 5, argued below that the Guideline makes § 2K1.1(b)(4) apply '[i]f firearm *was stolen,*' (emphasis added in Sentencing Memorandum); that the Guideline's wording is not 'if the firearm is subsequently deemed stolen, or if the firearm is being stolen.' *Id.*

Further, the Tenth Circuit Court added, "In its entirety, § 2K2.1(b)(4) reads: 'If any firearm *was* stolen, *or had* an altered or obliterated serial number, increase by 2 levels.' (Emphasis added.) As the underlined language shows, the Guidelines provision is concerned not with the way in which firearms and ammunition are acquired by a particular defendant, but rather with their condition when acquired, by whatever means." *Id.* The Tenth Circuit Court of Appeals in *Rowlett* ultimately ruled, "in light of the wording and purpose of § 2K1.1(b)(4), the district court erred in applying a two-level increase in Rowlett's offense level under that Guideline provision." *Id.* at 305.

In agreement with the Tenth Circuit Court of Appeals' opinion in *Rowlett*, Mr. Hamilton submits the meaning of the term "stolen" in § 2K1.1(b)(4) refers to firearms that were in a preexisting condition or status of being stolen *when acquired*, and does not refer to the status or condition of firearms in relation to *how* firearms were acquired, or the status or condition of firearms *after* firearms are acquired. Accordingly, a two-level increase

6

pursuant to § 2K1.1(b)(4) in Mr. Hamilton's case is not applicable or appropriate because the firearms he purchased and attempted to purchase from federally licensed dealers were not in a preexisting condition of being stolen when he acquired them. Rather, some of his purchased firearms later entered a condition of being stolen when Mr. Hamilton was burglarized of said firearms.

Even under the broad analysis of the firearms Guideline applied in *Luna*, Mr. Hamilton's course of conduct does not clearly trigger the application of § 2K1.1(b)(4) – (1) He purchased and attempted purchase from federally licensed firearm dealers; (2) he did not engage in trafficking of said firearms; (3) he was burglarized of some firearms; (4) he quickly reported the burglarized firearms as stolen.

*History and characteristics of the defendant*

Mr. Hamilton's history and characteristics, when considered in the context of the instant offense, reflect the dichotomy between his willingness and intent to be a law-abiding young man, and his poor decisions in committing the instant offense. Mr. Hamilton was born and primarily raised in Oklahoma City, Oklahoma by his paternal grandmother. *PSR ¶ 57*. His mother and father were never a couple but he spent time with each of them at their separate residences, his father in Oklahoma City, his mother in Arlington, Texas. While he spent sporadic years living in Texas with his mother, by the time he was 15 years old, he was solely cared for by his paternal grandparents. *PSR ¶ 58*. Not within Mr. Hamilton's control, his grandparents lived in a neighborhood controlled by the "Murder 1 Blood" gang of Midwest City, Oklahoma. Accordingly, from a young age, he grew up around people associated with this gang as his childhood friends had older family members

7

who were in the gang. This environment made it challenging for Mr. Hamilton's grandfather to shield him from gang activity and people associated with this gang. However, his grandfather was determined to protect Mr. Hamilton, he taught him about the dangers of associating with gangs. With intentionality, Mr. Hamilton's grandfather took him fishing, treated him to outings at their favorite restaurants, traveled Mr. Hamilton to Texas to watch Texas Rangers' baseball games and spoiled Mr. Hamilton with all the candy, clothing and shoes Mr. Hamilton desired. Mr. Hamilton fondly remembers the special relationship he had with his grandfather. These memories are emotion-producing. His grandfather was his best friend, his mentor and a primary source of positive affirmations. Devastatingly, Mr. Hamilton's grandfather passed away when Mr. Hamilton was 11 years old. *Id.* Mr. Hamilton reports the death of his grandfather was the triggering onset of severe mental health and trauma symptoms. *Id.* Shortly after his grandfather passed away, he was evaluated for mental health concerns and was indeed diagnosed with ADHD, bipolar disorder and schizophrenia. *Id.* The death of his grandfather caused a mental health breakdown, a fracture in his psychological health that he has never returned from. Mr. Hamilton reports, "I have not been the same in the head since I lost my grandpa."

      According to The National Child Traumatic Stress Network,[2] "Children who suffer from child traumatic stress are those who have been exposed to one or more traumas over

---

[2] "The National Child Traumatic Stress Network (NCTSN) was created by Congress in 2000 as part of the Children's Health Act to raise the standard of care and increase access to services for children and families who experience or witness traumatic events."

the course of their lives and develop reactions that persist and affect their daily lives after the events have ended."[3]

> Traumatic reactions can include a variety of responses, such as intense and ongoing emotional upset, depressive symptoms or anxiety, behavioral changes, difficulties with self-regulation, problems relating to others or forming attachments, regression or loss of previously acquired skills, attention and academic difficulties, nightmares, difficulty sleeping and eating, and physical symptoms, such as aches and pains. Older children may use drugs or alcohol, behave in risky ways, or engage in unhealthy sexual activity.
>
> . . .
>
> Without treatment, repeated childhood exposure to traumatic events can affect the brain and nervous system and increase health-risk behaviors (e.g., smoking, eating disorders, substance use, and high-risk activities). Research shows that child trauma survivors can be more likely to have long-term health problems (e.g., diabetes and heart disease) or to die at an earlier age. Traumatic stress can also lead to increased use of health and mental health services and increased involvement with the child welfare and juvenile justice systems. Adult survivors of traumatic events may also have difficulty in establishing fulfilling relationships and maintaining employment.

*Id*.

In addition to the childhood trauma associated with his grandfather's passing, Mr. Hamilton suffered other Adverse Childhood Experiences (ACEs) during the course of his childhood. ACEs are studied by the Centers for Disease Control and Prevention (CDC) and are defined as, "potentially traumatic events that occur in childhood."[4] Data shows numerous ACEs can have a tremendous impact on lifelong health and longevity, future victimization, future decision-making, and involvement with the criminal justice system.

---

[3] *See* The National Child Traumatic Stress Network at https://www.nctsn.org.
[4] *See* The Centers for Disease Control and Prevention: Adverse Childhood Experiences (ACEs) at https://www.cdc.gov/violenceprevention/aces/index.html

*Id.* Mr. Hamilton experienced other (non-exhaustive) ACEs as a child: grief, food and shelter insecurity, exposure to gang environment and associated activity, instability due to parental separation, mental health problems and childhood stress. *PSR ¶¶ 57-69*. Mr. Hamilton's innocent childhood was challenged and stunted by his neighborhood environment and lack of guidance and emotional support after losing his grandfather. When his grandfather was no longer there to guide him, he succumbed to creating friendships with people associated with gang activity. While he never officially joined the Murder 1 Blood gang, members of this gang took advantage of Mr. Hamilton's mental health status, longingness to be accepted and have friends, and desire to have a sense of belongingness like he had with his grandfather. Mr. Hamilton naively felt members of this gang cared about him like his grandfather did. Mr. Hamilton has since realized these gang members tried to use him and were never truly his friends. Given all the adverse childhood experiences and trauma, Mr. Hamilton survived. He was left to navigate a world without his grandfather in a gang-controlled environment, doing his best to help his grandmother survive poverty, all while battling his own mental health issues.

He was never offered trauma-based counseling or therapy for the loss of his grandfather, but he did voluntarily choose participate in mental health treatment. Further, Mr. Hamilton tried to bury his grief in playing football and other sports during his junior high school years. *PSR ¶ 58*. Due to his shaky mental health and the loss of guidance his grandfather provided, Mr. Hamilton left school at the age of 15. *Id.* His family did their best to encourage him during this low time and Mr. Hamilton responded to these efforts. At age 16, Mr. Hamilton attended Job Corps where he obtained his high school diploma.

*Id.* and ¶ 71. Mr. Hamilton remains very proud of this accomplishment. Ultimately, Mr. Hamilton used his education to do as best as he could.

After this turning point in his teenage years, Mr. Hamilton started to develop closer relationships with his parents. His parents are both invested in his well-being, including knowledge of and accountability in this prosecution. Between his parents, Mr. Hamilton has five half-siblings. *PSR ¶ 57.* He reports he appreciates his close relationships with all of his family members. He appreciates his father and grandmother's support while facing this prosecution. They were instrumental in his success on pretrial release.

Mr. Hamilton has never been married. *PSR ¶ 59.* He has two young children under the age of 3 and he reports he has positive relationships with his two co-parents. *PSR ¶ 59, 60.* He reports he does not have court-ordered child support but sends support and items to his children when he is able to. *Id.* at ¶ 60. He misses his children and looks forward to being reunited with them.

Healthwise, Mr. Hamilton has experienced a lot from a young age but is working to improve himself. Mr. Hamilton began using marijuana at the young age of 11, right after his grandfather passed away. *PSR ¶ 67.* An associate from his neighborhood offered to him to help cope with his grief. From there, he continued to experiment with other substances offered to him by peers, in desperation to find any way to cope with losing his grandfather. *PSR ¶ 68, 69.* Since his diagnosis at age 15, Mr. Hamilton, on his own, has participated in mental health treatment and care to address his co-occurring mental health and substance use issues. *PSR ¶ 64, 65.* His challenges in addressing these diagnostic concerns have remained. Most recently, Mr. Hamilton was doing his best to participate in

11

counseling sessions referred by the United States Probation Office. *PSR ¶ 70*. At his counseling sessions, he was receiving education on how his substance use and mental health diagnosis impact each other. *Id.* While he only had an opportunity to attend four counseling sessions before his bond was revoked, his counseling discharge summary indicates his chance of relapse was "moderate." *Id.*

While Mr. Hamilton recognizes his co-occurring mental health and substance use issues will require great attentiveness and diligent efforts for the rest of his life, he is committed to working toward supporting the most positive and healthy lifestyles for him and his children. He acknowledges this will begin with being mental health medicine compliant as well as being consistent in attending mental health counseling. When his mental health and sobriety are stable, Mr. Hamilton does well with completing educational goals and maintaining employment. *PSR ¶¶ 71-74*. When employed and struggling with mental health issues, Mr. Hamilton reports he recognizes these times and responsibly leaves his employment to regain mental health stability before reengaging with employment. *Id. at ¶ 74*. He is excited to complete business courses in his future and dreams of owning his own businesses. *Supra at ¶ 72*.

In 2021, Mr. Hamilton recalls walking to a corner store in north Oklahoma City when he was randomly shot by an unknown person. *PSR ¶ 63*. A bullet hit his leg and he suffered a fractured femur bone. *Id.* To date, he has no indication or idea as to who this perpetrator was and why the person shot at him. The lasting effects of this incident cause Mr. Hamilton pain and discomfort in his left leg. *Id.* While this physical limitation exists, Mr. Hamilton does not let it stop him from gaining employment.

Mr. Hamilton has a zero-point criminal history score. *PSR ¶ 57*. He received a fine on a misdemeanor charge for carrying a firearm while under the influence of drugs in 2022. *Id.* That conviction is the basis for his prohibition in purchasing firearms from federally licensed dealers. *PSR ¶¶ 20, 21*. He was unaware of this prohibition until notified by investigators in this matter. *Id.* As this instant matter will be his first felony conviction, he is fully aware of and accepting of the serious nature of his actions.

## THE NEED FOR THE SENTENCE IMPOSED

Congress provides significant penalties for ammunition cases. None of the statutory factors this Court must consider led to the conclusion that a sentence within the advisory sentencing guideline range is warranted in this case. Counts 1-3 and 6 carry a statutory maximum term of imprisonment of ten years per count. A sentence less than 46 months will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. A sentence within the advisory guideline range is not necessary to promote respect for the law. Finally, just punishment for this particular crime does not warrant a lengthy sentence.

Deterrence has already been accomplished. Mr. Hamilton does not need a lengthy term of imprisonment to convince him that making false statements in attempt to purchase firearms carries significant costs. Mr. Hamilton has been sitting in custody of the U.S. Marshal since October 12, 2022, pending case disposition and sentencing. Prior to that date, Mr. Hamilton successfully remained on pretrial release for nearly three months. Counsel recommends a sentence below that recommended by the advisory guidelines and a period of supervised release of two years.

**THE KINDS OF SENTENCE AND THE SENTENCING RANGE ESTABLISHED FOR THE APPLICABLE CATEGORY OF OFFENSE COMMITTED BY THE APPLICABLE CATEGORY OF DEFENDANT AS SET FORTH IN THE GUIDELINES**

The Presentence Report provides an advisory guideline range of imprisonment of 46 to 57 months. *PSR ¶ 79.* For a person of Mr. Hamilton's age, background and minimal criminal history, a sentence below guidelines would adequately reflect the seriousness of the offense and would not undermine the need to promote respect for the law.

This sentence would provide just punishment and adequate deterrence in that Mr. Hamilton will have to sacrifice freedom in his life in the interest of accountability. He will have to delay his pursuit of becoming a business owner and having a job to support his family and a healthier lifestyle for himself. He dreams of learning a trade and is hopeful for the opportunity to learn one during any continued incarceration. Specifically, he looks forward to engaging in educational programs, vocational training, mental health and medical care, and other correctional treatment that will ultimately equip him for his future, thus, protecting the public from any future crimes potential of Mr. Hamilton.

**PERTINENT POLICY STATEMENTS ISSUED BY THE SENTENCING COMMISSION**

Title 18, United States Code, §3661, provides "*no limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." (Emphasis added). This statutory language overrides the advisory policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age,

14

educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth. *See* USSG § 5H1.

This Court may take into consideration the role Mr. Hamilton's history and characteristics, in particular his childhood experiences, played in the commission of the instant offense. Mr. Hamilton is a young, 23-year-old Black man. Mr. Hamilton's loss of his grandfather's guidance and subsequent mental health breakdown resulting in multiple life-long mental health diagnoses, as an 11-year-old child, is a mitigating factor in this case. Without his grandfather's protection, he was introduced to people and coping mechanisms of a lacking environment, an environment controlled by a gang that deceivingly embraced him, but taught him unruly and detrimental behavior. Much, if not all, of Mr. Hamilton's childhood trauma and co-occurring mental health and substance use desire more attention. Without vital life skills, Mr. Hamilton was not able to transform his academic achievement of graduating high school into a powerful tool to ward off negative influences of the environment he was raised in.

### FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

Mr. Hamilton is not seeking a downward departure, but rather, a downward variance. As acknowledged in the PSR as significant and worthy of consideration for purposes of the Court considering a sentence outside of the advisory guideline system, Mr. Hamilton is a young, 23-year-old Black man who has never served a sentence of incarceration. *PSR ¶¶ 100-102.* He remarkably survived a childhood in which he lost his best friend who was also his greatest source of male guidance, his grandfather. After

suffering great grief and a mental breakdown after losing his grandfather, he voluntarily submitted to mental health treatment. However, his journey in mental health and co-occurring substance use treatment will require continued efforts to have the greatest impact on his decision making. He has a zero-point criminal history. *PSR ¶ 47.* A sentence within the calculated guidelines will unnecessarily impact Mr. Hamilton and his family for a prolonged period. The Court can still accomplish its goals in the imposition of a sentence by varying downward to a sentence well below the guidelines. Mr. Hamilton requests the Court impose a sentence below that recommended by the advisory guidelines and a period of supervised release of two years.

### THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT

Disparity is difficult to quantify. Facts and circumstances unique to the defendant and the alleged criminal activity often distinguish to a substantial degree one case from another. As noted by the Supreme Court in *Gall v. United States*, 552 U.S. 38, 55 (2007), the Court must also consider the need to "avoid unwarranted *similarities* among other [offenders] who [are] not similarly situated." Mr. Hamilton's unique and individual characteristics, as outlined above, warrant any potential disparities.

### NEED TO PROVIDE RESTITUTION

Restitution is not an issue in this case.

## CONCLUSION

A sentence below that recommended by the advisory sentencing guidelines and a period of supervised release is justified under the facts and the statutory factors this Court must consider.

Respectfully submitted,

*s/ Frances C. Ekwerekwu*
Frances C. Ekwerekwu
ASSISTANT FEDERAL PUBLIC DEFENDER
Bar Number 32613
215 DEAN A. McGEE AVENUE, Suite 109
OKLAHOMA CITY, OKLAHOMA  73102
(405)609-5967   FAX (405) 609-5932

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic filing to the following ECF registrants: Jacquelyn Hutzell, Assistant United States Attorney.

*s/ Frances C. Ekwerekwu*
Frances C. Ekwerekwu